Filed 9/1/21  In re N.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re N.D. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076628 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J282061, J282062) |
| v. | OPINION |
| S.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, S.S.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant, M.D.

1

Michelle D. Blakemore, County Counsel, and Pamela J. Walls, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

S.S., Mother and M.D. Father (Parents) appeal separately from the juvenile court's order terminating their parental rights to their daughter, N.D. (born in 2016), and son, A.D. (born in 2017). Parents, who join in each others' arguments, contend the juvenile court erred in finding the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) did not apply.

Mother argues noncompliance with ICWA based on San Bernardino County Child and Family Services (CFS) (1) failing to perform its duty of further inquiry by not contacting and interviewing the children's maternal aunt (Aunt) and godfather (Godfather) regarding the children's Indian ancestry[1], (2) failing to obtain any signed return receipts ("green card receipt") or letters of non-enrollment from the San Carlos Apache or Rosebud Sioux tribes, and (3) failing to provide notice of the juvenile dependency proceedings to Cherokee tribes.

Father contends that CFS failed to perform its duty of further inquiry by not contacting the children's maternal great-grandfather (MGGF). Father also argues that

---

[1]  Because the relevant federal statutes and regulations use the term "Indian," we do the same for consistency, even though we recognize that other terms, such as "Native American" or "indigenous," are preferred by many.

2

CFS's failure to arrange for visitation for him after his release from prison violated his due process rights.

We reject Mother and Father's arguments and affirm the order terminating parental rights.

## II.

## FACTS AND PROCEDURAL BACKGROUND

On July 21, 2019, Mother's sister reported to law enforcement that Mother had left the children with a known drug addict and had not returned after two hours. The children's maternal grandmother (MGM) told CFS that Mother frequently left the children with her while Mother went out and abused drugs. She would be gone for days with no way of contacting her. The children were about a year behind for immunizations and Mother had failed to take the children to the doctor for necessary treatment.

CFS met with Mother, the children, and the maternal grandparents (MGPs) to arrange for services to address the family's problems. Mother agreed to comply with a CFS plan providing services and to take the children to their doctor's appointments, but failed to do so. On August 8, 2019, Mother was arrested for battery (Pen. Code, § 242) and vandalism (Pen. Code, § 594, subd. (a)(1)). Two days later, Mother was arrested for driving or taking a vehicle not her own, without the consent of the owner (Veh. Code, § 10851, subd. (a)). MGM reported that Mother had said that when she was released the following day, she was going to move with the children to Alabama.

On August 12, 2019, the day after Mother's release, CFS took the children into protective custody. At the time, Father was incarcerated for vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1)). He was convicted and sentenced to prison in 2018, and eligible for parole in 2021. The children were placed with MGPs.

CFS filed a juvenile dependency petition on behalf of the children, alleging Parents failed to protect the children as a result of Mother's substance abuse and Father's incarceration. (Welf. & Inst., § 300, subds. (b), (g).[2]) The court ordered the children detained and placed with MGPs.

In September 2019, CFS reported the children were doing well in MGPs' home. MGPs were willing to adopt the children if Mother failed to reunify with them. Mother reportedly had failed to rehabilitate from her substance abuse problem, which impaired her ability to care for and supervise the children. At the September jurisdiction hearing, Parents waived their rights. The court found true the dependency petition allegations and the children were declared dependents under section 300, subdivisions (b) and (g).

Mother moved to Alabama in September 2019. During the disposition hearing in October 2019, the court found that the children's current placement with MGPs was appropriate and that Father was the presumed father of the children. The court ordered reunification services for Mother but not Father. In April 2020, CFS reported that Mother had moved back.

---

[2] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

In August 2020, CFS reported that the children had heart murmurs. N.D. was cross-eyed, had a stomach hernia, and suffered from PTSD. A.D. had learning delays from fetal alcohol syndrome. The children were doing well in MGPs' care. MGPs were planning to move with the children to a new home in Texas. At the contested review hearing in September 2020, the court terminated reunification services for Mother, set a section 366.26 hearing, and ordered CFS authority, upon ICPC[3] approval, for MGPs and the children to move to Texas.

CFS reported in its section 366.26 hearing report filed on January 8, 2021, that Father was released from prison on December 6, 2020, and had contacted CFS to arrange for visitation. CFS told Father visitation was not possible at that time because MGPs and the children were leaving for Texas the following day for the winter break. CFS further reported the children had been living with MGPs since August 13, 2019. MGPs were committed to taking care of the children and wanted to adopt them.

During the section 366.26 hearing on February 24, 2021, Parents objected to termination of parental rights and requested the court order guardianship. The children were currently living with MGPs in Texas. The juvenile court found that the children's medical conditions did not limit their adoptability. The court denied Parents request for an order of guardianship and found they had not met their burden of proving a parental relationship existed or that severing Parents' relationship with the children would result

---

[3] Interstate Compact on the Placement of Children (ICPC).

in great harm to the children.  The court further found the children were likely to be adopted and therefore terminated parental rights.

III.

ICWA PROCEDURAL BACKGROUND

CFS attached to the juvenile dependency petition ICWA form 010, entitled "Indian Child Inquiry Attachment," consisting of a declaration by a CFS social worker stating that CFS questioned MGM as to the children's Indian ancestry and found the children may have Indian ancestry.  The declaration stated the children are or may be members of the Apache, Sioux, and Nez Perce tribes.

In August 2019, Mother filed ICWA form 020, entitled, "Parental Notification of Indian Status."  She stated in the form that she is or may be a member of, or eligible for membership in the "Cherokee, black foot" tribes.

MGM filled out CFS form 390 A, entitled "RELATIVE:  Family Find and ICWA Inquiry."  She stated in the section entitled "Native American Ancestry Information," that she had or may have Indian ancestry in the "Apache, Sioux, Nespierce" tribes.  MGM did not know where the tribes were located.  She further stated that she did not know if the children had other relatives with Indian ancestry.

Maternal grandfather (MGF) also filled out CFS form 390 A, entitled "RELATIVE:  Family Find and ICWA Inquiry."  In the form section entitled "Native American Ancestry Information," MGF stated that it was unknown whether he had or might have Indian ancestry.  MGF further stated that the children had other relatives,

6

specifically MGM, who had Indian ancestry.  MGF did not know the name of the tribe or any related information.

At the detention hearing, Mother said she had Indian ancestry in the Cherokee, "Blackfoot," Apache, Nez Perce, and "Sioux tribes.  The court ordered Father also to fill out ICWA form 020, and both Parents to fill out CFS form 030 regarding Indian ancestry.  The court asked Mother if Father had any Indian ancestry.  She said he did not.

Mother filled out CFS form 030 A, entitled "PARENT:  Family Find and ICWA Inquiry."  Mother did not provide in the form any "contact information of relatives who know of Native American ancestry information."  However, under the section, "Additional Family Contact Information," Mother stated the name and phone numbers of the children's Aunt and Godfather.  Mother also provided the name of a friend but did not state her phone number or address.  Under the form section, "Native American Ancestry Information," Mother stated she has or may have Indian ancestry in the "Black foot" tribe.

In September 2019, CFS reported that it completed ICWA form 30 by interviewing Mother and MGM, but was unable to speak to any of the paternal family.  CFS stated it used the "CWS/CMS" database to research Father's ancestry and sent a letter in August 2019, to Father requesting Indian ancestry information.  CFS also attempted to contact Father through the litigation coordinator in September 2019, and left a message that CFS was inquiring regarding Father's Indian ancestry.

In September 2019, Father filled out form CFS 030 A ("PARENT: Family Find and ICWA Inquiry" form). He stated in the form that it was "Unknown" whether he had or might have Indian ancestry. Father also filed ICWA form 020 (Parental Notification of Indian Status), stating the children might be a member of, or eligible for membership in an Indian tribe, the name of which was "unknown."

During the September jurisdiction hearing, Father told the court he did not have any Indian ancestry but Mother and MGPs did. He said he did not know the tribe. The court continued the disposition hearing to allow CFS to provide ICWA notice.

In October 2019, CFS filed an ICWA declaration of due diligence, stating that ICWA notice was sent on October 10, 2019, to 26 Indian tribes, which included various Sioux, Apache, Nez Perce, Cherokee, and Blackfeet tribes. CFS attached to the declaration certified receipts, return receipts, and letters. The declaration stated the results of the notices and reported that no confirmation of membership or eligibility had been received to date. CFS also stated it had sent notice to the Bureau of Indian Affairs (BIA) and to Parents.

The "Notice of Child Custody Proceeding for Indian Child," which was provided to 26 Indian tribes, BIA, and Parents, included required information on Mother, Father, MGM, MGF (no information available), paternal grandmother (deceased), paternal grandfather (no current address or information available), and maternal great grandmothers and grandfathers (all deceased), with the exception of one (MGGF). The paternal great grandmothers and great grandfathers were unknown.

8

During the continued disposition hearing in October 2019, the court found that the children might come under the provisions of ICWA. The court also found that CFS had initiated compliance with ICWA noticing requirements.

In July 2020, CFS reported that it had provided notice as required under ICWA, and the required 65-day period after noticing the BIA and tribes had passed with no affirmative response of tribal membership. CFS filed a final ICWA declaration of due diligence reporting that, with the exception of the Oglala Sioux and the San Carlos Apache tribes, all of the tribes noticed on October 10, 2019, had returned letters confirming the children were not enrolled in the tribes or eligible for enrollment. Later, the Oglala Sioux and the San Carlos Apache tribes also confirmed receipt of service.

On July 2, 2020, the court found that ICWA notice had been conducted as required, and the required 65-day period of time since noticing the BIA and the tribes had passed, with no affirmative response of tribal membership received. The court ordered, without objection, that ICWA did not apply in the case and that no further notice was required.

On October 28, 2020, CFS filed another ICWA declaration of due diligence, stating that notice was sent a second time on October 13, 2020, to all of the previously noticed 26 Indian tribes, the BIA, and Parents. CFS also sent ICWA notices to three additional tribes. The declaration stated the results of the notices and that no confirmation of membership or eligibility had been received to date. CFS attached to the

9

declaration certified receipts, return receipts, and letters. Father reported in December 2020, that Mother, and not Father, had Indian ancestry.

On January 8, 2021, CFS filed a final ICWA declaration of due diligence, stating that ICWA notice was sent on October 13, 2020, to 29 Indian tribes, the BIA, and Parents. The declaration further stated the results of the notices, including that no confirmation of membership or eligibility had been received to date.

On January 13, 2021, the court found that notice had been provided as required and the required 65-day period of time since noticing the BIA and the tribes had passed, with no affirmative response of tribal membership received. The court ordered, without objection, that ICWA did not apply and that no further notice was required. Thereafter, on February 24, 2021, the court terminated parental rights.

IV.

ICWA COMPLIANCE

Parents contend CFS and the juvenile court failed to comply with their duty of further inquiry under ICWA.[4] Parents therefore request this court to conditionally reverse the order terminating parental rights and remand the matter to the juvenile court for further inquiry compliance.

A. *Standard of Review*

---

[4] Father acknowledges in his appellant's reply brief (ARB) that he is not arguing CFS or the court did not fulfill their duty to conduct further inquiry of paternal family members. Father states in his ARB: "Father does not and has not argued that the duty of further inquiry due in this case extended to any paternal family members." Mother also does not raise such an objection regarding paternal family members.

10

"'[W]here the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied.' [Citations.] However, 'we review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports the court's order. [Citations.] We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance.'" (*In re D.F.* (2020) 55 Cal.App.5th 558, 565; accord *In re A.M.* (2020) 47 Cal.App.5th 303, 314.) Parents, as appellants, have the burden to show that the evidence was insufficient to support the findings and orders. (*In re Austin J.* (2020) 47 Cal.App.5th 870, 885 (*Austin*).)

B. *Applicable ICWA Law*

ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; *In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8.) The Indian child, the parent, and the Indian child's tribe have the right to intervene in any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child." (25 U.S.C. § 1911(c).)

For purposes of ICWA, an "Indian child" is an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a

11

member of a federally recognized tribe. (25 U.S.C. § 1903(4), (8); see § 224.1, subd. (a) [adopting federal definitions].)

ICWA provides that, "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).)

Federal regulation 25 C.F.R. § 23.107(a) imposes a duty to inquire whether a child is an Indian child. In section 224.2, California has enacted a statute that parallels the federal regulations. Section 224.2, subdivision (a) provides that the court and child protective agencies remain under "an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child." That duty to inquire and to make further inquiries obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child. (§ 224.2, subds. (a)-(e); see *In re D.F.* (2020) 55 Cal.App.5th 558.)

Section 224.2, subdivision (c) provides: "At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."

Subdivision (d) of section 224.2 lists six circumstances, any one of which constitutes "reason to know." The only circumstance that is potentially applicable here is in subdivision (d)(1): "A person having an interest in the child, including . . . a member of the child's extended family informs the court that the child is an Indian child." (See also 25 C.F.R. § 23.107(c)(1).)

Subdivision (e) of section 224.2 provides: "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."

"There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (§ 224.2, subd. (e)(1).)

Subdivision (e)(2) of section 224.2 instructs that, "[w]hen there is reason to believe the child is an Indian child, further inquiry is necessary to help the court, social worker, or probation officer determine whether there is reason to know a child is an

Indian child."  Further inquiry includes, but is not limited to, (1) interviewing the parents and extended family members; (2) contacting the BIA and State Department of Social Services; and (3) contacting tribes the child may be affiliated with, and anyone else, that might have information regarding the child's membership or eligibility in a tribe.  (§ 224.2, subd. (e)(2).)  If after conducting further inquiry, there is reason to know that the child is an Indian child, CFS shall provide the requisite ICWA notice to the child's tribe. (§§ 224.2, subd. (f); 224.3, subd. (a)(5).)

The purpose of ICWA and California's parallel statutes is to enable a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the juvenile dependency proceeding.  (*In re K.R.* (2018) 20 Cal.App.5th 701, 706 (K.R.).)  "'[R]esponsibility for compliance' with those statutes 'falls squarely and affirmatively' on *both* the social services agency and the court."  (*Id.* at p. 709, quoting *Justin L. v. Superior Court* (2008) 165 Cal.App.4th 1406, 1410.)  Even though the parents do not object at any point below to the sufficiency of the inquiry or of the notice given, the issue is cognizable in this appeal.  (*K.R.*, *supra*, at p. 709.)

C. *Duty of Further Inquiry*

Parents contend CFS and the court failed to comply with their ICWA duty of further inquiry by not contacting Aunt, MGGF, or Godfather, even though contact information was available.  CFS contends it was not required to contact them under ICWA.

14

CFS and the court met their initial duty of inquiry by obtaining Indian ancestry information from Parents and MGPs. Mother and MGM stated that the children had or might have Indian ancestry in Sioux, Apache, Nez Perce, Cherokee, or Blackfeet tribes through MGM. Mother also stated on ICWA form 020 that she is or may be a member of, or eligible for membership in the Cherokee and "black foot" tribes. The record thus demonstrates there was "reason to believe" the children were Indian children under section 224.2, subdivision (e), which gave rise to CFS's duty to further inquire regarding the children's Indian ancestry.

CFS further investigated the children's possible Indian ancestry by sending notices to 29 tribes and the BIA. There was no affirmative response of any tribal membership or eligibility. Therefore the court found that notice had been conducted as required by ICWA, with no affirmative response as to tribal membership or eligibility, and ICWA did not apply..

The issue here is whether CFS and the court still had a duty of further inquiry, which required CFS to contact Aunt, MGGF, and Godfather. Under section 224.2, subdivision (e)(2), "further inquiry" includes interviewing extended family members." (§ 224.2, subd. (e)(2)(A).) CFS "has the obligation to make a meaningful effort to locate and interview extended family members to obtain whatever information they may have as to the child's possible Indian status." (*In re K.R.* (2018) 20 Cal.App.5th 701, 709.)

"'"[E]xtended family member[s]'" includes the child's 'grandparent, *aunt* or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second

cousin, or stepparent.' (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).) *It does not include great-grandparents.*" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053, italics added.) CFS failed to comply with this obligation by not interviewing Aunt, who qualified as an "extended family member." (*Ibid*.)

MGGF and Godfather do not qualify as an "extended family member." However, "further inquiry" under section 224.2, subdivision (e)(2)(C) includes contacting "any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).) There is no evidence in the record that MGGF or Godfather might "reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(C).) Neither Parents nor MGPs stated that MGGF or Godfather knew anything about whether the children had Indian ancestry. Mother only mentioned Godfather once, solely as an additional family contact. He was not listed as someone who had Indian ancestry information. It is unclear whether Godfather is a relative of the children. MGGF was only mentioned in the IWCA notice, in the section listing biological relatives. His name, address, birth date, and place of birth were provided. There was "no information available" as to whether he was a member of a tribe. Under federal and state law, additional information regarding MGGF was required to be provided only if known. (*In re Charlotte V.* (2016) 6 Cal.App.5th 51, 57.)

Parents thus have not established that there was a duty of further inquiry as to MGGF or Godfather, because there was no evidence of any reason for CFS or the court

16

to believe MGGF or Godfather might have any Indian ancestry information, particularly after CFS noticed 29 tribes and the BIA, with no affirmative response the children or Parents were members or eligible for membership in any of the Indian tribes. We therefore conclude the evidence is thus insufficient to show any noncompliance under section 224.2(e)(2)(C), by CFS not contacting MGGF or Godfather.

Father argues the instant case is similar to *In re T.G.* (2020) 58 Cal.App.5th 275 (*T.G.*), in which the court held there was a duty of further inquiry and remanded the case for further ICWA inquiry. In *T.G.*, the juvenile court ordered the social services agency to provide ICWA notice to the Cherokee tribe and BIA, and investigate the father's claim of possible Indian ancestry. The agency failed to do so. Nevertheless, the juvenile court granted guardianship and terminated jurisdiction without any order or findings that ICWA did not apply. The court in *T.G.* court held the juvenile court and agency failed to comply with their ICWA duties of further inquiry and notice. (*Id*. at pp. 280-281.)

In reaching its holding, *T.G.* rejected the court's holding in *Austin J.* that a parent's express statement of Indian ancestry is insufficient to constitute a "reason to believe" an Indian child may be involved, triggering a duty of further inquiry. (*T.G.*, *supra*, 58 Cal.App.5th at pp. 293-295; *Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889.) The *Austin J.* court concluded that, "[e]ven if we assume that the possibility of Indian ancestry may suggest the possibility of Indian tribal membership, that bare suggestion is insufficient by itself to establish a reason to believe a child is an Indian child." (*Id*. at p. 889.) The *Austin J.* court reasoned that such a statement is insufficient because it alone does not

provide reason to believe the child is a member of a tribe or the biological child of a member, which is required in order for a child to be an Indian child under ICWA. (*Id.* at pp. 888-889.)

The court in *T.G.* disagreed, holding that a parent's statement and similar statements by relatives that the child may have Indian ancestry is sufficient to trigger a duty of further inquiry. (*T.G.*, *supra*, 58 Cal.App.5th at pp. 293-295.) The *T.G.* court therefore remanded the matter for further inquiry based on responses the court received from the mother and maternal grandmother that the mother had Cherokee ancestry and the children also had Indian ancestry through their maternal great grandfather and maternal grandmother.

Regardless of the conflict between *Austin J.* and *T.G.* regarding whether there was a duty of further inquiry, the instant case is distinguishable from both cases and there is no dispute that there initially was a duty of further inquiry based on Mother and MGM's responses of Indian ancestry. The issue here is whether the court's and CFS's further inquiry was insufficient under ICWA and the State statutes because CFS did not contact Aunt, MGGF, or Godfather. We conclude substantial evidence supports the juvenile court's finding of compliance with the duty of further inquiry.

CFS was required to conduct "a meaningful and thorough inquiry" regarding the children's "possible Indian ancestry, including interviews with extended family members and any other persons who may reasonably be expected to have information regarding the children's tribal membership or eligibility for membership and contact with any tribes

18

that may have such information." (*T.G.*, *supra*, 58 Cal.App.5th at p. 297.) There is substantial evidence CFS did so, even though CFS did not contact Aunt, MGGF, or Godfather. CFS and the juvenile court could have reasonably concluded based on information received from the tribes, BIA, Parents, and MGPs that no further inquiry was needed because there was no additional information of value to obtain from Aunt, MGGF, or Godfather. There was no evidence those individuals had or might have any additional knowledge of the children's Indian ancestry, particularly when none of the 29 tribes contacted indicated that the children had Indian ancestry.

CFS was not required to "cast about" for information or pursue unproductive investigative leads. (*In re Levi U.* (2000) 78 Cal.App.4th 191, 199.) Based on the record, we conclude there was substantial evidence supporting the court's conclusion that CFS complied with its further inquiry obligations. (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1053.) When the juvenile court found that there was no longer a duty of further inquiry and ICWA did not apply, further inquiry, including contacting Aunt, MGGF, and Godfather, was not required because there was no reason to believe at that point that they had any additional information or that the children were Indian children.

D. *Harmless Error*

Even if the juvenile court and CFS erred in not contacting Aunt, MGGF, or Godfather, any such error was harmless. Father argues that it was "possible" the tribes' responses to the notices would have been different had CFS and the court conducted a proper inquiry of Aunt, MGGF, and Godfather. Relying on *In re A.C.* (2021) 65

19

Cal.App.5th 1060 (*A.C.*), CFS argues that any error in not contacting the three individuals was harmless because there is no reason to believe that doing so would have made any difference in the outcome. We agree. The information obtained from Parents, MGPs, and the tribes confirmed the children were not Indian children under ICWA or the state statutes.

"Deficiencies or errors in an ICWA notice are subject to harmless error review." (*In re Charlotte V.*, *supra*, 6 Cal.App.5th at p. 57.) As we noted in *K.R.*, "in general, an appellant has the burden of producing an adequate record that demonstrates reversible error. [Citation.] However, ICWA compliance presents a unique situation, in that, as we have just discussed, although the parent has no burden to object to deficiencies in ICWA compliance in the juvenile court, the parent may nevertheless raise the issue on appeal. [Citation.] The purpose of ICWA and the California statutes is to provide notice to the tribe sufficient to allow it to determine whether the child is an Indian child and whether it wishes to intervene in the proceedings. [Citation.] The parent is in effect acting as a surrogate for the tribe in raising compliance issues on appeal. Appellate review of procedures and rulings that are preserved for review irrespective of any action or inaction on the part of the parent should not be derailed simply because the parent is unable to produce an adequate record." (*K.R.*, *supra*, 20 Cal.App.5th at p. 708.)

In *K.R.*, we concluded there was prejudicial error because the social services agency had not provided a record of its efforts undertaken to comply with ICWA. There was no evidence the agency had contacted the paternal aunt, paternal grandparents, or

paternal great-grandmother, even though there was contact information available for them. In *K.R.*, we remanded the matter for further inquiry because, unlike in the instant case, the record indicated that the paternal aunt, paternal grandparents, and paternal great-grandmother would likely provide additional information that would assist in determining whether the children had Indian ancestry. (*K.R.*, *supra*, 20 Cal.App.5th at pp. 707-708.)

In *A.C.*, *supra*, 65 Cal.App.5th 1060, we did not remand the matter for further inquiry because we concluded there was no prejudicial error. In *A.C.*, the father did not provide any evidence of Indian ancestry or claim Indian ancestry in the juvenile or appellate courts. (*Id*. at p. 1067, 1073.) We held in *A.C.* the error did not constitute reversable prejudicial error because the father could have, but did not, establish prejudice by submitting on appeal post-judgment evidence showing he had Indian ancestry and the juvenile court record was silent as to whether he had Indian ancestry because CFS did not inquire. (*Ibid*.)

Even though *A.C.* is distinguishable, this court's discussion in *A.C.*, of prejudicial error in general is instructive here. As we explained in *A.C.*, "'[A]ny failure to comply with a higher state standard, above and beyond what . . . ICWA itself requires, must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error. [Citations.]' [Citations.]" (*A.C.*, *supra*, 65 Cal.App.5th 1069.) This means a parent asserting failure to inquire as to an extended family member must show, at a minimum, that, if asked, the extended family member would have provided new information of Indian ancestry.

21

Where the record below fails to demonstrate this, a miscarriage of justice has not been established and reversal is not required. (*A.C.*, *supra*, at p. 1069.)

Any error here in CFS not contacting the Aunt, MGGF, or Godfather is not one of federal law. (*A.C.*, *supra*, 65 Cal.App.5th at p. 1069.) "There is no federal duty to inquire of extended family members. In any event, assuming there was a federal statutory error, and assuming (without deciding) that the reversibility of such an error is a federal question [citation], there is a harmless error rule under federal law, too. (28 U.S.C. § 2111.) '[T]he party that "seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted." [Citations.]' [Citation.]" (*A.C.*, *supra*, 65 Cal.App.5th at pp. 1069-1070.)

In *A.C.*, we rejected the father's argument he did not have to make an affirmative showing of prejudicial error because "a parent will not necessarily be aware of his or her Indian ancestry. Part of the error here is that CFS failed to inquire of extended family members. Thus, we cannot know for certain whether the error did or did not prevent it from discovering Indian ancestry on the father's side." (*A.C.*, *supra*, 65 Cal.App.5th at p. 1070.)

As we noted in *A.C.*, "[t]he flaw in this argument is that 'an appellant has the burden of producing an adequate record that demonstrates reversible error. [Citation.]' [Citation.].) Admittedly, in *In re K.R.*, we recognized an exception to this rule when the record is inadequate because of the social services agency's failure to document its inquiries. [Citations.]" (*A.C.*, *supra*, 65 Cal.App.5th at p. 1070, citing *In re K.R.*, *supra*,

at p. 705 and *In re N.G.* (2018) 27 Cal.App.5th 474, 481.) That exception does not apply here because this case does not involve CFS failing to document its inquiries.

In *In re N.G.*, *supra*, 27 Cal.App.5th at page 482, the court noted regarding the exception to the burden of proof rule, that the "holding in *K.R.* is at odds with established case law which has applied the substantial evidence rule to claims of ICWA error, and which has treated the appellant (usually a parent) as having the burden of demonstrating prejudicial ICWA error on appeal based on an adequate record. (E.g., *In re Charlotte V.*, *supra*, 6 Cal.App.5th at pp. 57-58.) But in a case such as this one, where the record does not show what, if any, efforts the agency made to discharge its duty of inquiry (§ 224.3, subd. (a); [*In re*] *Michael V.*, [(2018)] 3 Cal.App.5th [225,] 233), and the record also does not show that all required ICWA notices were given or that the ICWA notices that were given included all known identifying information, the burden of making an adequate record demonstrating the court's and the agency's efforts to comply with ICWA's inquiry and notice requirements must fall squarely and affirmatively on the court and the agency. In the absence of an appellate record affirmatively showing the court's and the agency's efforts to comply with ICWA's inquiry and notice requirements, we will not, as a general rule, conclude that substantial evidence supports the court's finding that proper and adequate ICWA notices were given or that ICWA did not apply. Instead, as a general rule, we will find the appellant's claims of ICWA error prejudicial and reversible."

Here, unlike in *N.G.* and *K.R.*, the appellate record affirmatively shows the court's and CFS's efforts to comply with ICWA's inquiry and notice requirements. Thus, any

error in the CFS not contacting Aunt, MGGF, or Godfather is subject to harmless error review and is not presumed prejudicial, with the burden of proof on Parents to show prejudice. (*In re Charlotte V.*, *supra*, 6 Cal.App.5th at p. 57.) Based on the record, we conclude that Parents have not met their burden of proof of establishing prejudicial error.

Unlike in *K.R.* and *N.G.*, the record demonstrates CFS made a concerted effort to discharge its duty of further inquiry and that all required ICWA notices were given and included all known identifying information. We therefore conclude CFS and the court fulfilled their duty of further inquiry by the time the court ordered that ICWA did not apply, even though Aunt, MGGF, and Godfather had not been contacted. The juvenile court and CFS could have reasonably found that it was unlikely that any additional inquiry would have produced additional information regarding the children's Indian ancestry.

A parent asserting failure to inquire as to an extended family member must show, at a minimum, that, if asked, the extended family member would have provided new information of Indian ancestry. Where the record below fails to demonstrate this, a miscarriage of justice has not been established and reversal is not required. (*A.C.*, *supra*, 65 Cal.App.5th at p. 1069.) There is no evidence in the record that Aunt, MGGF, or Godfather had or might have any new information regarding the children's Indian ancestry. In addition, 27 of the 29 noticed tribes confirmed that the children were not members or eligible, and the remaining two tribes, confirmed receipt of ICWA notice but did not bother to respond.

24

Substantial evidence shows that CFS thoroughly investigated the children's Indian ancestry and the investigation demonstrated that the children do not have Indian ancestry through either parent and are not Indian children under ICWA or the state statutes. We therefore conclude that, if there was any error in CFS and the court not contacting Aunt, MGGF, or Godfather, such omission was harmless error.

E. *Notice to Cherokee Tribes, Green Card Receipts, and Letters*

Mother contends in her AOB that CFS and the court's compliance with the duty of further inquiry was inadequate because CFS did not provide ICWA notice to Cherokee tribes and did not obtain green card receipts or letters of non-enrollment from the San Carlos Apache and Rosebud Sioux tribes. The record does not support these contentions. The ICWA Declaration of Due Diligence filed on October 28, 2020, states that CFS noticed three Cherokee tribes, and receipts confirming service were signed for two of the Cherokee tribes. As to the third Cherokee tribe noticed, the tribe provided letters confirming no enrollment of the children and no intervention by the tribe. Another Cherokee tribe also provided letters confirming no enrollment of the children and no intervention by the tribe. The record shows notice was provided to the Cherokee tribes.

The record also shows that CFS obtained green card receipts and letters of non-enrollment from the San Carlos Apache and Rosebud Sioux tribes. CFS received a signed green card for the Rosebud Sioux tribe acknowledging receipt of notice. CFS also received a letter from the tribe confirming the children were not enrolled in the tribe or eligible. There is also evidence in the record that notice was provided to the San Carlos

25

Apache tribe, including a signed green card acknowledging receipt of notice.

V.

## VISITATION

Father contends his due process rights were violated by being denied visitation after his release from prison. He argues that had he been able to visit the children, he could have established the beneficial parent-child relationship exception to adoption applied. He also argues that there was insufficient evidence that CFS properly discharged its duties to secure visitation for Father in accordance with the court's orders. We conclude there was no violation of Father's due process rights because of Father not being able to visit the children after his release from prison.

Father did not live with the children after his incarceration on June 14, 2018, and was not released from prison until December 6, 2020. The court ordered supervised visitation for Father one time per week for two hours, upon his release from prison. After his release, Father attempted to contact CFS and left messages on December 8, 9, and 14, 2020. CFS spoke to Father on December 16, 2020, during which Father requested visitation. CFS told Father most likely visitation would not be possible at that time because MGPs and the children were leaving for Texas on December 16, 2020, for the winter break. CFS told Father to call back to arrange for visitation upon their return from Texas.

During the section 366.26 hearing on February 24, 2021, Father testified that he had lived with the children from the time of their birth until he was incarcerated on June 14, 2018. Mother brought the children to the jail to visit him once or twice a week for 11 months, during which he saw them through a glass barrier. That ended on May 16, 2019, when he was moved to state prison. This was the last time he saw the children. Father did not have any contact with the children while in prison or after his release on December 6, 2020.

The CFS social worker, J.A., testified that when Father contacted her after his release from prison, she told him that, because the children were leaving for Texas for the winter break the following day, a visit before then would probably not be possible. J.A. told Father to call her back to schedule a visit, but he never did. To her knowledge, he also did not call anyone else at CFS or MGPs to ask for visitation.

During the section 366.26 hearing, the court found that Father had not made a sufficiently concerted effort to reach out to the children while in prison or visit them after his release. He also had not stood in a parental role for quite some time. The court therefore found that the benefits of adoption outweighed any benefit of Father maintaining a parent-child relationship, and thus terminated his parental rights.

"At a section 366.26 hearing the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.] Adoption is the preferred plan and, absent an enumerated exception, the

27

juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions."  (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.)  "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

One of the exceptions to the preference for adoption is the beneficial parent-child relationship exception.  The exception provides that the court shall terminate parental rights unless "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The existence of this relationship is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."  (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576.)

The parent must not only demonstrate the positive aspects of the relationship, but "must show the child would suffer detriment if his or her relationship with the parent were terminated."  (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)  For the exception to apply, severing of the relationship must "'deprive the child of a *substantial*, positive

emotional attachment such that the child would be *greatly* harmed.'" (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.) "'A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.'" (*Ibid.*)

Although there is the possibility that CFS could have immediately responded to Father's first call on December 8, 2020, and arranged for a supervised, two-hour visit before the children left for Texas, there is no evidence doing so would have made any difference in the outcome of the case. Even if there was error in CFS not arranging a visit in December 2020, it was thus harmless error. It is highly unlikely that such a visit, or even visits thereafter, which he never took any initiative to arrange, would have resulted in the court finding the beneficial parent-child relationship exception to adoption applied.

There also is no evidence that terminating Father's parental rights would be detrimental to the children. Father had not lived with them for over two and a half years and he had not had any contact with the children while in prison. Therefore, if there was any error in CFS not arranging for Father to visit the children after his release from prison, it was harmless error.

## VI.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

SLOUGH

J.

FIELDS

J.